# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

HOWARD WALTER THOMAS,     )
                                )
          Petitioner,        )
v.                                 )          3:10-cv-22
                                )         *Judge Phillips*
                                )
HAROLD CARLTON, Warden,      )
                                )
          Respondent.       )

## <u>MEMORANDUM</u>

This is a petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by petitioner Howard Walter Thomas ("petitioner"). The matter is before the court on the respondent's answer to the petition and petitioner's reply. For the following reasons, the petition for the writ of habeas corpus will be **DENIED** and this action will be **DISMISSED WITH PREJUDICE**.

I.     <u>Standard of Review</u>

A state prisoner is entitled to habeas corpus relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254. Under Rule 8 of the Rules Governing Section 2254 Cases In The United States District Courts, the court is to determine, after a review of the answer and the records of the

case, whether an evidentiary hearing is required.  If no hearing is required, the district judge is to dispose of the case as justice dictates.  If the record shows conclusively that petitioner is not entitled to relief under § 2254, there is no need for an evidentiary hearing and the petition should be denied.  *Baker v. United States*, 781 F.2d 85, 92 (6th Cir. 1986).

II.    <u>Factual Background</u>

The respondent has provided the court with copies of the relevant documents as to petitioner's direct appeal and post-conviction proceedings.  [Court File No. 15, Notice of Filing, Addenda 1-29].  Petitioner was convicted of first degree premeditated murder, especially aggravated kidnapping, especially aggravated robbery, and attempted first degree murder.  He was sentenced to life imprisonment on the murder conviction, concurrent 22-year sentences on the kidnapping and robbery convictions to be served concurrent with the life sentence, and a consecutive 25-year sentence on the attempted murder conviction, for a total effective sentence of life plus 25 years.  The convictions were affirmed on direct appeal, with the Tennessee Court of Criminal Appeals reducing the sentence for attempted first degree murder to 21 years and reducing the sentences for robbery and kidnapping to 18 years each. *State v. Thomas*, No. E2003-02090-CCA-R3-CD, 2005 WL 735040 (Tenn. Crim. App. March 30, 2005) [Addendum 15], *perm. app. denied, id.* (Tenn. Oct. 10, 2005) [Addendum 18], *cert. denied*, 547 U.S. 1004 (2006) [Addendum 20].

The Tennessee Court of Criminal Appeals gave a lengthy summary of the evidence at trial as follows:

2

Because of the complexity of this matter, we first will give an overview of the facts. While passing through Knoxville on the morning of March 23, 1991, on their way to vacation in North Carolina, John and Yvonne Cook of Wausau, Wisconsin, exited Interstate 275 to check their map for directions. While they were stopped on the entrance ramp, an assailant shot into their van, driven by Mr. Cook, who was struck twice. The shooter, later identified as the defendant, then got into the van with them and drove to a rural area of Knox County. After demanding money from Mrs. Cook, the defendant dumped Mr. Cook's body on the side of the road and ordered Mrs. Cook out of the van. He forced her onto the ground and attempted to shoot her but had trouble reloading his weapon. A passing motorist startled the defendant, who fled the scene in the victims' van. By that time, Mr. Cook had died. The defendant was arrested nine years later; and the trial, which is the basis for this appeal, followed.

Testifying as the State's first witness at trial, Mrs. Cook said that she was asleep in a make-shift bedroll behind the front captain's chairs in the van on the morning of March 23, 1991, and awoke when her husband pulled off the interstate in Knoxville and onto a ramp. It was raining heavily. As he turned the map light on and reached to get the atlas from the dashboard, he said, "Oh, my God." She then heard an explosion, followed by another "pop," as he slumped over in the seat toward her. She knew that he was injured "because there was a lot of blood ... coming from mostly behind his left ear." At this time, Mrs. Cook was "sitting pretty much between the two front captain seats" on the floor. The defendant began smashing out the driver's side window, trying to get into the van, saying, "[H]ow the fuck do you get this power lock-this lock open?" He then opened the door and began pushing Mr. Cook out of the driver's seat. Mrs. Cook unlatched her husband's seatbelt, and the defendant pushed him into her arms. She got a "[f]ull facial view" of the defendant as he got into the driver's seat because the map light was on and all of the dome lights in the van came on when he opened the door. She also noticed he was carrying a gun, which he laid across his lap with the barrel pointing at her head. Mrs. Cook testified that, at this point, the defendant was sitting "[j]ust inches" from her, and she could have touched him if she had wanted to.

The defendant then drove back onto the interstate, headed north, the direction from which the Cooks had just traveled. She applied pressure to her husband's neck "in hopes that [she] could do something to save his life," and begged the defendant to release them so she could get medical help for her husband. The defendant refused, saying, "Shut up, you fucking bitch. He's

3

already dead." They continued on the interstate for approximately fifteen to twenty minutes at a "[v]ery high rate of speed." Mrs. Cook said that after "maybe 10 minutes," her husband's heart stopped beating. When she again begged the defendant for medical help for Mr. Cook, the defendant said, "Shut the fuck up and don't look at me. I'm going to kill you, too." The defendant then exited the interstate and drove to a rural, two-lane road where he "would kind of speed up and then he would go real slow, and I thought, 'Well, he's looking for a place to stop and kill me and dump us out.' " By that time, Mrs. Cook had realized that her husband was dead. The defendant pulled over to the right side of the road and demanded money from her, stating, "[I]t better be more than a hundred dollars." She reached into her purse, pulled out her husband's wallet, and gave the defendant the cash from the wallet. The cash was in "many denominations of tens and twenties" and totaled somewhere between "five hundred, eight hundred, perhaps even a thousand dollars." Mrs. Cook said that, as she handed the money to the defendant, she was "covered with blood" and her husband's blood was all over her hands.

The defendant then told Mrs. Cook, "Get the fuck out of here and get him out of here." She opened the passenger side sliding door and attempted to pull her husband's body out of the van but was unable to do so. The defendant then exited the van, came around behind it, and "dumped" Mr. Cook's body out onto the ground. Asked how close she was to the defendant, Mrs. Cook replied, "Oh, I stood up right next to him." She said that the defendant was shorter than she. He ordered Mrs. Cook not to look at him and to get down on her hands and knees beside her husband. He then pointed the gun at Mrs. Cook's head as he attempted to load it, but he had trouble doing so because he was wearing "black leather-type gloves." Several of the bullets fell on the ground beside Mrs. Cook. Still on the ground, Mrs. Cook continued to beg for her life, saying, "John is already dead. I have two children that need me more now than ever." The defendant responded, "Shut the fuck up. I'm not going to rot in some fucking prison because you can identify me." Mrs. Cook said a white car then came down the road, shining its lights onto her, which caused the defendant to flee in the van.

Law enforcement officers arrived soon thereafter, and Mrs. Cook tried to recount what had happened and the route they had traveled. She also rode with officers in an effort to retrace their route. They subsequently returned to the scene, where she met Detective Charlie Bundren of the Knoxville Police Department ("KPD"). Mrs. Cook then went to the police station and gave a detailed description of the assailant, including that he was very young, had no facial hair, and had been wearing a dark-colored jacket and a camouflage scarf

4

around his head "that was clear down onto his eyebrows and tied behind his head." Later in the day, the van was located.

Mrs. Cook testified that, shortly after returning home, she began seeing a psychiatrist, Dr. Sheila Stanton. At her suggestion, Mrs. Cook agreed to undergo hypnosis and began meeting with Dale Sternberg, a clinical social worker, who explained to her that the sessions would be a "form of relaxation and concentration."[1] Mrs. Cook said that the reason she wanted to do this was to "help do something to solve the case." Asked about the hypnosis, she explained that she was in a state of "deep concentration and relaxation," always aware of her surroundings, and during these sessions, her image of the assailant never changed.

[1]Because these sessions were the basis for one of the assignments on appeal, as well as the subject of a pretrial hearing, we will discuss them more thoroughly when we review the suppression issues raised by the defendant.

Subsequently, she met with a police sketch artist from the Wausau Police Department who prepared a composite of the assailant, which Mrs. Cook rated a "seven" on a scale of one to ten. She "believed it was the best that we could do" but that it did not "look exactly like the person." During the year following the incident, Mrs. Cook viewed photographic and video lineups from the KPD in a cooperative effort with the Wausau Police Department. Although she saw similarities in the lineups, she never identified anyone as the assailant.

In May 2000, Detective Bundren phoned Mrs. Cook and told her that the KPD had arrested a suspect. Shortly thereafter, a friend in Knoxville sent her a newspaper article from the Knoxville News-Sentinel about the arrest, the article including small photographs both of her husband and the defendant as he appeared in 2000 ("newspaper photograph"). Mrs. Cook identified the defendant in court as the person who committed the crimes against her and her husband, as well as a photograph of the clean-shaven defendant as he appeared in 1990 ("1990 photograph").[2]

[2]This photograph is also the basis for an assignment which we will more thoroughly review in our analysis.

On cross-examination, Mrs. Cook acknowledged that during the ordeal, she had seen the defendant mostly by his profile and that she had "always felt

5

that that would be the best way that [she] could identify the individual." She did not recall ever receiving any profile shots from the police department, only head shots. She acknowledged that one subject in the video lineup shown to her in July 1992 had similarities to the assailant, and his profile and body language were as she had remembered the assailant's. Although she requested a tape of the subject's voice, she never received one.

Leroy Jarvis, the resident at 9109/9111 Norris Freeway where Mr. Cook's body was dumped, testified that he went outside to get the newspaper around 6:00 a.m. on March 23, 1991, and, while returning to his house, saw a "late model GM van" pulling out of his driveway. He went inside, but because his dog continued barking, Jarvis went back outside and saw Mrs. Cook kneeling at the end of his driveway. She said, "I think my husband's dead," and he saw Mr. Cook's body lying facedown at the end of his driveway. Jarvis called 9-1-1 and stayed with Mrs. Cook until emergency personnel arrived.

Jack Thomas, a retired Knox County Sheriff's Department crime scene technician, testified that he recovered bullets from the ground beside Mr. Cook's body, which he identified in court as .22 caliber bullets, and "automotive-type glass" from the side of the road.

Knoxville Police Officer Dick Evans testified that he was patrolling his "beat boundaries" sometime after 6:30 a.m. on March 23, 1991, when he saw the victims' van backed into a business in the area of Dutch Valley, "where it comes into Central Avenue and Coster," but continued on his patrol. Shortly thereafter, he received a "be on the lookout" ("BOLO") over the radio for a stolen vehicle and immediately remembered the van he had seen earlier. Officer Evans returned to the scene, looked inside the van, noticed the driver's side window had been broken out and a large amount of blood in the van, and secured the scene until the KPD crime scene unit arrived.

James Humphrey, a federal court security officer for the United States Marshals Service who was a Knoxville police officer in 1991, said that he was the "lead specialist for the crime lab, crime scene processing." Humphrey said he processed the victims' van, which was "in total disarray like it had been ransacked." The front seats were "bloody, quite a bit of blood" and they were unable to get any identifiable fingerprints from the vehicle, only "smudges." The van was located at Bruhin Road and Central Avenue Pike, near Interstate 640. According to Humphrey, while a fence in the area would prevent a person from crossing the interstate on foot, a bridge across the interstate, which was

6

identified on redirect as a train track, would allow travel south across Interstate 640 and back into Knoxville.

Retired KPD Detective Charlie Bundren testified that he was on duty as a homicide investigator on March 23, 1991, and was contacted around 8:00 a.m. to go to the location on Norris Freeway. Shortly after arriving, he drove Mrs. Cook to the location where the van had been discovered, and she identified it as hers. Bundren noticed that the driver's side window had been broken out and that the door on the driver's side was open. He then took her to the hospital to "see if [she] could see a doctor or something about the state of mind she was in and to-for Mr. Cook." After they left the hospital, they went to Interstate 275 where Mrs. Cook retraced the route she and her husband had been traveling. He determined the location of the crimes to be the Merchants Road exit, as had the Knox County Sheriff's Department. Mrs. Cook then returned to the police station with Detective Bundren and gave a tape-recorded statement and description of the suspect. After the suspect's description was broadcast, the police department "started getting calls from citizens about they thought they were being shot at on the interstate. We did have two or three instances where vehicles-some kind of object hit their vehicle." He also sent photographic and video lineups to the law enforcement agency in Wisconsin where Mrs. Cook lived, but eventually the investigation "just kind of dried up."

To follow up on a lead, Detective Bundren and two other detectives went to Atlanta, Georgia, in May 2000 where they talked to Mary Storm and got the names of two suspects, Ernest Salyer and the defendant, Howard Walter Thomas. After returning to Knoxville, Detective Bundren located Ernest Salyer, who was brought in on May 17, 2000, to give a statement, as were Salyer's mother, Joyce Salyer; his sister, Sammie Salyer; and his wife at the time, Loretta Strange. Later that evening, he charged the defendant with felony murder and called Mrs. Cook to advise her that an arrest had been made. He said that after May 17, 2000, he believed the correct location of the crimes was the Woodland Avenue exit.

On cross-examination, Detective Bundren said that in 1991 there was a Howard Johnson Hotel at the Merchants Road exit but not at the Woodland Avenue exit. He said that none of the lineups sent to Mrs. Cook contained a photograph of the defendant because he was not a suspect at the time. He did not have any suspect profile shots to send to the Wausau Police Department even though Mrs. Cook had emphasized that her best view of the assailant was from the side. However, one of the video lineups did depict profiles of the suspects.

FBI Special Agent Michael Freeman testified that in March 1991, he was a homicide detective with the Knox County Sheriff's Department and was the first detective on the scene on Norris Freeway. After Mrs. Cook calmed down somewhat, he went with her and another detective to retrace the route the defendant had driven when they were in the van. They went back to Interstate 275 and began traveling southbound toward the Knoxville city limits, and "[w]hat struck [them] was there was an obvious difference ... once you passed ... from the county roads into the city area, it became illuminated." He said that, as they approached Merchants Road, "[t]he lights opened up and she seemed-you know, recollection began to ... come forth, and she said, 'This may be it.' " They exited the interstate at Merchants Road and by then it was daylight and no longer raining. Agent Freeman testified that he and his partner knew "that our jurisdiction was gone" and that they would be turning the case over to the KPD. They never went further south on the interstate to the Woodland Avenue exit but instead returned northbound to the location of Mr. Cook's body on Norris Freeway.

Ernest Salyer[3] testified that he and the defendant were "[b]est friends, like brothers," and he had known the defendant since he was fourteen or fifteen years old. On March 23, 1991, Ernest lived with his mother, Joyce Salyer, in Knoxville and early that morning, he received a telephone call from the defendant who asked him to come pick him up at a car wash on Heiskell Avenue. When Ernest arrived at the car wash, the defendant, dressed in blue jeans, a jacket, and a bandana around his head, "c[a]me out from around the corner of the car wash." As the defendant got into the car, Ernest noticed that he had blood on his jacket and jeans and was carrying a rifle wrapped in a blanket or a sheet. The defendant told Ernest that he had "killed somebody." According to Ernest, the defendant lived on West Oak Hill Avenue, off Woodland Avenue, at the time. He said the defendant's house was "[p]robably a couple of blocks" from the Woodland interchange at the interstate and about a mile from the car wash. They went to the defendant's house, where the defendant told Ernest "he run across the interstate and shot in a vehicle, jumped in it and drove them to Norris Freeway." The defendant told Ernest that, on Norris Freeway, he "got the woman out and he was going to shoot her and started reloading his gun and it got jammed and a car come and scared him and he took off." They then went to Ernest's house, where he told his mother that the defendant had been in a fight and asked her to wash the defendant's clothes, which she did. Asked about the defendant's facial hair, Ernest said, "I don't believe he had much, if he had any at all." Ernest and the defendant then went to the home of Ernest's grandmother, Goldie Storm, in order to hide the gun, which Ernest identified as a ".22 semi-automatic." Afterwards, they

8

returned to Ernest's house where the defendant gave Ernest's sister, Sammie, a twenty-dollar bill, which had some blood on it, and told her to buy something for her son. Later that evening, Ernest told his mother, "[The defendant] killed somebody, and I took the gun to my grandmother's and hid it." Two or three days later, Ernest and the defendant retrieved the gun from his grandmother's house, and the defendant took it with him. At that time, Ernest noticed that the defendant had dyed his hair black.

[3]Because Ernest Salyer and Joyce Salyer both testified at the trial, we will utilize their first names in referring to them. We intend no disrespect by this procedure but do so to avoid continually repeating the full names of the witnesses.

Ernest was then shown the 1990 photograph and a 1991 photograph and identified both as photographs of the defendant, saying that the 1990 photograph looked more like the defendant as he had appeared on March 23, 1991. Ernest said that in the nine years since the crimes, the defendant mentioned the crimes "[m]ostly when he was drinking." Ernest explained that the reason he did not inform the police about what the defendant had done was because he was scared and loved the defendant "like a brother, didn't want to see him in trouble." On cross-examination, Ernest acknowledged that, on the day of the crimes, the defendant could have looked more like the 1991 photograph than the 1990 photograph.

Joyce Salyer testified that the defendant called her house early in the morning on March 23, 1991, asking for Ernest, who left and returned later with the defendant. The defendant's clothes had blood on them, and he said he had been in a fight. She washed his clothes and gave him some others to wear. Ernest and the defendant left the house and, when they returned, Sammie Salyer was there. The defendant gave Sammie a twenty-dollar bill, and Joyce noticed the money "had red on it ... [l]ooked like blood." Later, Joyce became concerned that Ernest and the defendant were not telling her the truth and, after watching the news report concerning the murder, talked to Ernest who "told [her] about it." When she found out about the gun, she asked Ernest to get it from her mother's house because her mother "didn't need to be involved in this." Joyce said she put the defendant's clothes in a plastic bag and gave them to her mother to burn. She identified the 1990 and 1991 photographs of the defendant and said the defendant looked more like the 1990 photograph on the day of the murder.

Goldie Storm testified that on March 23, 1991, around 11:00 a.m., Ernest and the defendant came to her house with a .22 rifle. Ernest asked if she could keep the gun for a few days, and she agreed. He put the gun in the living room closet, where it remained until he and the defendant returned two days later and removed it from the house. She told Joyce to bring the defendant's clothes to her house where she burned them with the garbage.

Sandy Buckner, a friend of the defendant, testified that she was working at Vol Market, a twenty-four-hour convenience store on the corner of Woodland and Central, on March 23, 1991. The defendant came into the store during the very early morning hours, and around 5:00 a.m. she gave him a ride home. He was wearing boots, blue jeans, and a leather jacket and had a bandana in his pocket or on his head. When she saw the defendant in the store a few days later, his hair was darker and he was dressed differently than normal, now wearing tennis shoes. She said the defendant seemed "worried," because the description of the suspect in the newspaper "could have been him." He told her he changed his hair color because he was "afraid that he would match ... look like the guy in the newspaper." She said the defendant "asked me that was he with me that night, ... the previous night before, and I said yeah."

Loretta Strange, Ernest Salyer's ex-wife, testified she was sixteen years old on March 23, 1991, and remembered hearing on the news about a man being shot by a sniper. Approximately two weeks later, she and the defendant, who were dating,[4] were watching the television show "Hunter" when the defendant said, "I'm glad there's not cops like that here in Knoxville, because if so, I'd already be arrested." She asked him what he was talking about, and he replied, "The guy on the interstate, I did that, and if there were cops like that here, I'd already be arrested." Sometime later in 1991, while she and the defendant were walking down a path through the woods near the defendant's house, he said, "This is where I killed that guy.... [T]his is where I did it. I sat up here. I shot at cars, and I hit somebody." Strange said the path was "right next to the [Woodland Avenue] exit," which was "[a] couple of blocks maybe" from the defendant's house. Four or five years later, after the defendant had been fighting with his wife and Strange had problems with one of her ex-husbands, the defendant told her "he had killed someone once before, and he could do it again if he had to, and he was in reference to the I-75 thing."

[4]Apparently, Loretta Strange dated Ernest Salyer and the defendant when she was a teenager and later married and

divorced Ernest. She testified, "We were always kind of a threesome, me, Ernest, and [the defendant]."

Strange also said that, shortly after the murder, the defendant's "black denim jacket" with "beads and leather patches on it" just "disappeared one day." Because he had promised it to her, she asked him where it was, and he replied, "It's gone. It's gone." On cross-examination, Strange said that, after the murder, the defendant dyed his hair black, "so black that it looked blue in the light," and that before March he had "cut his hair and became kind of clean cut looking for a little while." She also testified that, at one point, he told her he "accidentally" shot someone on the interstate and "that if [she] told anyone he would kill [her]."

On redirect, Strange said that, after the defendant told her about the shooting, he explained the details:

> He got in the van. He made the woman hold her husband as he drove her around. I don't know exactly where he drove her to. He'd had a conversation with her saying he was going to have to kill her because he wasn't going to prison and that she was the only witness. He was actually going to kill her. He had her outside of a van fixing to shoot her. A car came along; scared him. He got in the van and left.

Sammie Salyer testified that there was a red spot on the twenty-dollar bill the defendant gave her on March 23, 1991, but she had "no idea what it was." She did not see the defendant with a wad of cash that morning.

Counsel stipulated to the testimony of Dr. Francis Jones, a retired pathologist who performed the autopsy on Mr. Cook, that the cause of death was "two small caliber-.22 caliber gunshot wounds to the head." It was further stipulated "that the wounds were survivable with immediate treatment.... [T]here would be an immediate loss of consciousness. The victim could have lived for up to possibly 10 minutes. There would be hemorrhaging from the wounds. The heart would beat rapidly, and eventually stop."

Lieutenant Glen Edward Biggs of the KPD testified that on March 25, 1991, he was at the Woodland Avenue exit investigating a different case, when he found a "quantity of safety glass" on the entrance ramp to the interstate. He informed Detective Bundren of the glass but did not collect it. Biggs also assisted with the investigation of Mr. Cook's death and testified regarding a

videotape he made on April 17, 2003, from a police cruiser retracing the route from Woodland Avenue to 9111 Norris Freeway, which was 14.2 miles and took about eighteen minutes to drive. He said that the distance between the defendant's house and the Woodland Avenue exit was approximately two city blocks, and a railroad track was a route between the car wash on Heiskell Avenue and the location where the victims' van was found. Another detective "ran all the way down the railroad tracks" from Heiskell Avenue to the car wash, which took about eleven minutes. He estimated the distance between the location of the van and the car wash at approximately one mile.

Following this testimony, the State rested its case in chief, and the defendant elected not to testify or put on any proof.

After the verdicts were announced by the jury, Mrs. Cook testified, "I feel death for [the defendant] would be a too-easy way out. It is my wish that you sentence him to life imprisonment." The State then withdrew its notice of intent to seek the death penalty, and the court imposed a life sentence for the defendant on the first degree murder conviction.

*Id.*, 2005 WL 735040 at **1-9.

Petitioner next filed a petition for post-conviction relief, which was denied after an evidentiary hearing, and the Tennessee Court of Criminal Appeals affirmed. *Thomas v. State*, 298 S.W. 2d 610 (Tenn. Crim. App. Feb. 12, 2009) [Addendum 26], *perm. app. denied, id.* (Tenn. Aug. 17, 2009) [Addendum 29].

In support of his petition for the writ of habeas corpus, petitioner alleges the following: (1) the issues surrounding the identification of petitioner at trial violated his rights to due process, a fair trial, and confrontation of witnesses; (2) the per se rule in effect at the time of trial, which barred the introduction of expert proof on the unreliability of eyewitness identification, violated petitioner's rights to due process, compulsory process, and a fair trial; and (3) the cumulative effect of these errors violated petitioner's right to due process and a

fair trial. The respondent contends he is entitled to judgment as a matter of law based upon the findings of the Tennessee state courts.

III.    <u>State Court Findings</u>

On April 24, 1996, President Clinton signed into law the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The AEDPA significantly restricted the federal courts' jurisdiction to consider and grant habeas corpus relief to state prisoners. Pursuant to 28 U.S.C. § 2254(d), as amended by the AEDPA, petitioner may not obtain federal habeas corpus relief with respect to a claim that was adjudicated on the merits in a state court proceeding unless the state court decision (1) was contrary to, or involved an unreasonable application of, clearly established federal law or (2) was not reasonably supported by the evidence presented to the state court. In addition, findings of fact by a state court are presumed correct and petitioner must rebut the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e).

The Supreme Court, in *Williams v. Taylor*, 529 U.S. 362 (2000), clarified the distinction between a decision "contrary to," and an "unreasonable application of," clearly established Supreme Court law under § 2254(d)(1). A state court decision is "contrary to" Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Id*. at 413. A state court decision "involves an unreasonable application of clearly established Federal law"

13

only where "the state court's application of clearly established federal law was objectively unreasonable." *Id*. at 409. A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411.

Recent case law indicates what a high bar a habeas petitioner must meet under the standard set by the AEDPA. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "[A] habeas court must determine what arguments or theories supported or ... could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Id*. The Supreme Court acknowledges this is a very high standard. "If this standard is difficult to meet, that is because it is meant to be." *Id*. *See also Renico v. Lett*, 130 S. Ct. 1855, 1866 (2010) ("AEDPA prevents defendants -- and federal courts -- from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts."); *Peak v. Webb*, 673 F.3d 465, 472 (6th Cir. 2012) ("[T]he Supreme Court has very recently made abundantly clear that the review granted by the AEDPA is even more constricted that AEDPA's plain language already suggests.") (citing *Harrington v. Richter*, 131 S. Ct. at 786).

14

Petitioner has failed to rebut, by clear and convincing evidence, the findings of the state courts and they will be presumed correct by this court. In light of the foregoing, the court will consider petitioner's claims for relief.

IV.   Discussion of Claims

The court will consider petitioner's claims for relief, as presented in his petition for writ of habeas corpus and set forth below in bold, in turn.

**I.    The issues surrounding the identification of the defendant at trial deprived Mr. Thomas of due process, a fair trial, and the right to effective confrontation under U.S. Const. Amend. VI and XIV.**

**A.    The admission at trial of hypnotically influenced testimony, to the extent that it bolstered confidence, without contemporaneous recordings of all hypnotic sessions, deprived Mr. Thomas of the rights to due process, a fair trial, and confrontation under U.S. Const. amend. VI and XIV.**

Petitioner alleges that Mrs. Cook should not have been allowed to testify as to what she had told the authorities after she had been hypnotized and that the trial court erred in denying the motion to suppress her post-hypnosis testimony. Petitioner claims that, under *State v. Glebock*, 616 S.w.2d 897 (Tenn. Crim. App. 1981), hypnotically refreshed testimony is inadmissible unless a contemporaneous recording of the hypnotic sessions was made and provided to the defense and the court. Petitioner also cites *Beck v. Norris*, 801 F.2d 242 (6th Cir. 1986), for the proposition that failure to comply with *Glebock* constitutes a violation of due process. According to petitioner, only two of the four hypnotic sessions were recorded;

15

petitioner also argues that the hypnosis was performed by someone with no training in forensic hypnosis or memory recall techniques. In this regard, petitioner claims that the hypnosis bolstered Mrs. Cook's confidence in her identification of petitioner as the one who killed her husband. Petitioner contends that, although Mrs. Cook's general description of the assailant was substantially the same both pre-hypnosis and post-hypnosis, she did not identify the petitioner until she was shown a photograph of him post-hypnosis.

The Tennessee Court of Criminal Appeals disagreed with petitioner's contentions that the Mrs. Cook's testimony was inadmissible under *Glebock* or that it was bolstered by hypnosis.

> We respectfully disagree both with this analysis and conclusion. First, we disagree with the defendant's characterizing the issue as the use of "hypnotically refreshed" testimony. In fact, as the trial court correctly noted, Mrs. Cook, even before the hypnosis sessions, gave detailed and accurate descriptions of the defendant, rather than filling in details of the incident itself as occurred in *Glebock* although the additional details there were not relevant to guilt or innocence. As for the defendant's claim that hypnosis "greatly enhanced" the confidence of Mrs. Cook "in her recall of events," this simply is his view. The trial court did not find this had occurred, and there is no basis for our doing so either. Since, according to Mr. Sternberg, the only unrecorded portion of the hypnosis sessions as to events in Tennessee was the "induction" part, where she actually was being hypnotized, we would be speculating were we to conclude anything occurred during this time that affected the defendant's right to due process of law. Accordingly, we conclude that the defendant's arguments as to this issue are without merit.

*State v. Thomas*, 2005 WL 735040 at *17 (footnote omitted).

In finding Mrs. Cook's testimony admissible, the appellate court recounted the relevant testimony of Mrs. Cook, Dale Sternberg, and defense expert Dr. Michael Nash during the evidentiary hearing on the motion to suppress Mrs. Cook's testimony. *Id*. at **9-

16

14. The court specifically noted that Mrs. Cook met with Dale Sternberg six times; that four of those meetings were hypnosis sessions, two of which were audiotaped; and that during the two sessions that were not taped, Dale Sternberg "only questioned Mrs. Cook concerning the details of her trip before leaving Wisconsin and that the other two hypnosis sessions, dealing with the events in Knoxville on the day of the murder, were taped." *Id*. at *12. The court also considered and rejected the evidence by a defense expert that Mrs. Cook's confidence was enhanced by hypnosis:

> On the day of the crimes, March 23, 1991, when Mrs. Cook was interviewed by Detective Bundren, she described the assailant in detail:
>
>> A white male, very young, 17 yrs old or younger, no older than 22 years, very fair complexion, very straight nose, sharp pointed features, appeared that he hadn't started shaving yet, slender build, 140 lbs, and about 5'5" tall. He had medium brown hair with about 3 inches hanging down in back below the bandana. The bandana was olive green in color and he wore it over his eyebrows and across the top of his ears. He had on all dark clothing. A light weight cotton type jacket, maybe navy blue in color, and he had on ski type heavy gloves. He was armed with a .22 cal. weapon.
>
> Mrs. Cook met with the police sketch artist on October 11, 1991, shortly after she had completed the hypnosis sessions, and described the assailant in almost identical terms:
>
>> [A] young male, white between the ages of 17-22 yrs. She stressed that he was fine featured, slight of frame, had smooth, light complected skin with no scars or visible acne. She said that he was not tall, giving his height as between 505-506 and his weight in the range of 125-140 lbs, with medium brown hair showing at the neck from under a camouflage green bandana which was tied over and around his entire forehead, being fastened at the lower back of his head.... She stressed his young

17

appear[a]nce and further said that his features were almost feminine.... Regarding the suspect[']s attire she said that beyond the camo green headgear she thought he had on a waist length, dark coloured [sic], zippered jacket. She said also that she remembered that the suspect wore gloves which she described as a rather thin, black leather glove that was either unlined or rather lightly lined.

...

There is nothing in the record to show that the hypnosis of Mrs. Cook brought out previously unremembered key facts or brought to her mind a description of the assailant that did not exist before. On the day of the murder, Mrs. Cook gave a detailed description of the defendant. She was provided at least one set of photographs and one videotape of potential suspects, neither of which included the defendant, and she did not make an identification from either group.

*Id.* at \*\*14-15.

The court also noted that the facts in *Beck v. Norris*, the federal case cited by

petitioner to support his claim of a denial of due process, "were similar to those of the

present case." *Id*. at \*15.

There, five eyewitnesses to an armed robbery and second degree murder gave descriptions of the suspect to the police. Later that day, they participated in the drawing of a composite, which was circulated to law enforcement. Within a few days, each of the witnesses was individually hypnotized by an investigative hypnotist in "an attempt to elicit any additional details concerning the crime." After the hypnosis sessions, the witnesses participated in the preparation of a second composite, resulting in the identification of the defendant by an inmate in the local county jail. The defendant asserted he was denied a fair trial and due process. The court disagreed with the defendant's claim that the hypnosis session had caused the witnesses to identify him as one of the assailants:

We cannot agree that under the circumstances presented here the use of testimony of witnesses who had been hypnotized

18

deprived defendant of a fair trial. First, there is evidence to refute defendant's claim of undue suggestibility. For instance, the composite drawings made before the hypnosis session and after the hypnosis session were very similar. Although the hypnosis apparently aided in sharpening the drawing of petitioner, the similarity between the two drawings indicates that the second composite was not the product of suggestibility. Indeed, there was no motivation to influence the hypnotized subjects, as no suspect for the crime had yet been identified. Second, on the evening of the crime, the witnesses individually viewed a photographic array consisting of approximately 100 photographs of possible suspects. Petitioner's photograph was not included in the array. The witnesses made no identification at that time. Finally, another witness ... was not subjected to hypnosis and did not participate in the identification procedures utilized with the crime witnesses. She identified petitioner as the man she saw run from the entrance of the motel immediately after the commission of the crimes.

*Id*. at **15-16 (quoting *Beck*, 801 F.2d at 243, 344).

The court finally noted the overwhelming evidence against petitioner in addition to Mrs. Cook's testimony.

Even if we were to exclude the entire testimony of Mrs. Cook, the fact would remain that the most incriminating testimony at trial came from two witnesses who were not subjected to hypnosis, Ernest Salyer and Loretta Strange. On several occasions, the defendant admitted the killing to both. He told Salyer on the day of the murder that he had "killed somebody" and had "shot in a vehicle, jumped in it and drove them" away. He told Strange, "The guy on the interstate, I did that," "This is where I killed that guy," "I shot at cars, and I hit somebody," and he "had killed someone once before, and he could do it again." Even had Mrs. Cook's testimony been suppressed, the evidence still was sufficient for a rational jury to be convinced of the defendant's guilt beyond a reasonable doubt and, accordingly, it will not be disturbed. Nor are we convinced that any part of Mrs. Cook's "hypnotically refreshed" testimony affected the judgment or resulted in prejudice to the judicial process. The record supports the trial court's denial of the motion to suppress the identification of the defendant by Mrs. Cook.

19

*Id*. at *17 (internal citations omitted).

This court has reviewed the entire record of petitioner's direct appeal. The findings of the Tennessee Court of Criminal Appeals are supported in the record. The appellate court's determination that the admission of Mrs. Cook's testimony did not violate due process was neither contrary to, nor did it involve, an unreasonable application of, federal law. *See, e.g., Cone v. Bell*, 556 U.S. 449, 451 (2009) (due process guarantees to criminal defendants the "right to a fair trial").

Petitioner clearly had a fair trial. Mrs. Cook was subjected to a vigorous cross-examination, as where the other witnesses against petitioner. The defense brought out many discrepancies in the witnesses' testimony. Unfortunately, the evidence against petitioner was overwhelming and he is not entitled to relief on this claim.

> **B.** **The identification made by the only eyewitness in this case, based upon the photograph of the defendant taken after his arrest and some nine years after the incident constituted an impermissible overly suggestive show-up.**

This claim was raised by petitioner on direct appeal:

> The defendant contends that Mrs. Cook's viewing of his 2000 newspaper photograph, and her subsequent certainty that he was the assailant, amounted to an impermissible, overly suggestive show-up, which was made even more so by the fact that nine years earlier Mrs. Cook had undergone hypnosis that inflated her confidence. Because the newspaper photograph was not part of a photographic array, he argues that Mrs. Cook's identification of him pretrial was inadmissible and she should not have been allowed to make an in-court identification.

*State v. Thomas*, 2005 WL 735040 at *17.

The Tennessee Court of Criminal Appeals disagreed. In doing so, the appellate court first noted that, because a "'friend of an acquaintance,' and not a law enforcement official" mailed the photograph to Mrs. Cook, there was no state action and thus no due process violation. *Id.* at *18 (citing *State v. Reid*, 91 S.W.3d 247 (Tenn. 2002) and *Bishop v. State*, 582 S.W.2d 86 (Tenn. Crim. App. 1979)).

Nevertheless, the appellate court also considered the factors set forth in *Neil v. Biggers*, 409 U.S. 188 (1972), concerning alleged suggestive show-ups, which had been adopted by the Tennessee Supreme Court in *Bennett v. State*, 530 S.W. 2d 511 (Tenn. 1975).

> The relevant factors are: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.

*State v. Thomas*, 2005 WL 735040 at *18 (citing *Bennett*, 530 S.W. 2d at 514).

In addition, the appellate court noted that the *Bennett* court had also adopted the "totality of the circumstances" rule enunciated by the Supreme Court in *Simmons v. United States*, 390 U.S. 377 (1968).

> [W]e hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

*Simmons*, 390 U.S. at 384.

Based upon the foregoing, the Tennessee Court of Criminal Appeals agreed with the trial court that petitioner's argument lacked merit.

The defendant in the present appeal argued in his supplemental motion to suppress Mrs. Cook's testimony that her seeing the single newspaper photograph amounted to an "unconstitutional photographic show-up that presents the danger of irreparable misidentification in violation of the due process provisions" and that this was aggravated by the fact that she had undergone hypnosis, inflating her confidence in her identification. The trial court applied the *Biggers* factors and disagreed with the defendant's argument, concluding that the victim's viewing of the newspaper photograph did not prevent her identifying the defendant at trial:

> While the first three factors do not weigh in favor of the defendant's argument, the level of certainty factor as well as the elapsed time factor arguably weigh in favor of suppression. The evidence presented at the evidentiary hearing shows that the victim had ample opportunity to observe the assailant under favorable lighting conditions. The victim testified in detail regarding her efforts to observe the assailant and note details of his physical description. The victim also remained consistent in her descriptions of the assailant and the accuracy of these descriptions to the actual physical characteristics of the defendant is consistent. While the level of certainty demonstrated by the victim could have been affected by hypnosis, the victim's actual description of the assailant remained remarkably consistent and unchanged after undergoing hypnosis. Relative to the elapsed time between the offense and the identification, the court notes that the victim has never viewed a photograph of the defendant as he appeared in 1991 at the time of the offense. In applying the *Biggers* factors to this identification, the court concludes that the procedure was not so impermissibly suggestive as to deny the defendant due process by creating a substantial likelihood of misidentification. The court will certainly allow the defendant the opportunity to fully cross examine Mrs. Cook before the trier of fact who will ultimately judge the credibility of any identification.

We agree with the trial court that the *Biggers* factors adopted by the court in *Bennett* have been satisfied in this case. We further hold that under the "totality of the circumstances" test also set forth in *Bennett*, there is "substantial other testimony to validate the identification of the defendant as being the culprit who committed the crime[s]" against the victims in this case,

primarily the testimony of Ernest Salyer and Loretta Strange. Accordingly, this issue is without merit.

*State v. Thomas*, 2005 WL 735040 at **19-20.

The findings of the Tennessee Court of Criminal Appeals are supported in the record. The appellate court's determination that the admission of Mrs. Cook's in-court identification did not violate due process was neither contrary to, nor did it involve, an unreasonable application of, federal law. *See, e.g., Neil v. Biggers*, 409 U.S. at 381-82 ("It is the likelihood of misidentification which violates a defendant's right to due process ....").

As the state courts noted, Mrs. Cook had ample opportunity to observe petitioner during the commission of the crime, and her descriptions of her husband's killer remained consistent. Petitioner is not entitled to relief on this claim.

> **C.** **A second overly suggestive identification, this time the result of explicit state action, occurred when a single photograph of the defendant that had never previously been viewed by the witness was shown to Yvonne Cook by the prosecutor in the middle of trial.**

Petitioner also raised this issue on direct appeal. The Tennessee Court of Criminal Appeals summarized the issue as follows:

> At the close of the first day of testimony in the trial, the State ended its direct examination of Mrs. Cook. When the trial resumed the following morning, the court allowed the State to ask Mrs. Cook a few more questions before cross-examination. Over objection by the defense that the photograph was a prejudicial "one-person show-up of the defendant," the trial court, in a jury-out hearing, allowed Mrs. Cook to view the 1990 photograph of the defendant. She responded affirmatively when asked if the photograph showed the defendant "close to the way he appeared" at the time of the crimes. Mrs. Cook also testified that the first time she had seen the 1990 photograph was that morning in the prosecutor's office after having identified the defendant in

23

court the day before. On cross-examination, with the jury out, Mrs. Cook testified concerning the circumstances of being shown the 1990 photograph. The defense again objected to the introduction of the photograph, and the trial court overruled the objection and allowed the 1990 photograph to be introduced. The State then resumed questioning Mrs. Cook about the photograph with the jury in the courtroom, and she was also cross-examined about it. At that time, the defense showed Mrs. Cook the 1991 photograph of the defendant, taken three weeks before the crimes, and questioned her concerning the defendant's appearance in that photograph. The 1991 photograph showed the defendant with "black" hair and "facial hair," whereas the 1990 photograph showed the defendant with brown hair and no facial hair.

On appeal, the defendant argues that Mrs. Cook's "in-court identification was tainted by this unconstitutional show up," the 1990 photograph was overly suggestive, and her identification should not have been admitted. As we will explain, we disagree with the defendant.

*State v. Thomas*, 2005 WL 735040 at *20.

The appellate court first noted that Mrs. Cook had identified petitioner as the person who killed her husband on the first day of trial and prior to being shown the 1990 photograph. *Id*. The court further noted that Mrs. Cook testified that her in-court identification was not based upon photographs she had seen but upon the incident itself. *Id*. at *21. Based upon that, the court found no error in allowing the 1990 photograph into evidence.

[I]t appears that the prosecution was simply attempting to use the 1990 photograph to illustrate what the defendant looked like at the time of the murder. The defendant also contends that the State should have utilized the March 1991 photograph instead, because it was taken closer in time to the date of the crimes. We agree that the trial court properly allowed the defendant to enter the 1991 photograph into evidence in an effort to question the credibility of the witness's identification of the 1990 photograph as being the one showing the defendant's appearance at the time of the crimes. Accordingly, we cannot conclude that the trial court abused its discretion as to this ruling.

24

*Id.*

The findings of the Tennessee Court of Criminal Appeals are supported in the record. The use of the 1990 photograph at trial was not an impermissibly suggestive show-up of petitioner. Mrs. Cook had already identified him at trial as her husband's killer. In addition, the defense questioned Mrs. Cook as to the differences between the 1990 and 1991 photographs. Petitioner is not entitled to relief on this claim.

> **II.** **The per se rule in effect at the time of the defendant's trial that barred the introduction of expert proof on unreliability of eyewitness identification denied the defendant the rights to due process, compulsory process, present a defense, call favorable witnesses, and a fair trial under U.S. Const. amend. V, VI, and XIV.**

Petitioner unsuccessfully attempted to present at trial expert testimony concerning the unreliability of eyewitness identification. As the Tennessee Court of Criminal Appeals explained:

> The defendant filed a notice of his intent to present at trial the expert testimony of Dr. Elizabeth Loftus, Ph.D., professor of psychology at the University of California, who would testify as to "the factors affecting the identification made by Yvonne Cook." The State responded by filing a motion in limine, asserting that the testimony of Dr. Loftus was inadmissible pursuant to the holding of our supreme court in *State v. Coley*, 32 S.W.3d 831 (Tenn.2000), as to eyewitness testimony. Replying to that argument, the defendant argued that the "identification of the defendant by Yvonne Cook present[ed] specific and unique problems," consisting of the gap in time between the crimes and her identification of the defendant, the use of hypnosis, and her seeing a news article and photograph of the defendant prior to her identification of him. Thus, applying *Coley*, the defendant argued that the opinion testimony of Dr. Loftus was "permissible to substantially assist the trier of fact."

As requested by the trial court, the defendant filed a two-page memorandum prepared by Dr. Loftus, summarizing the testimony which she would present at trial. According to the memorandum, there were "factors present in the current case that are known to create problems for accurate eyewitness testimony," and she would be prepared to testify about the "workings of human memory," the effects of factors such as suggestions on memory, and the creation and characteristics of false memories. She would identify and explain "factors that are important in the current case," such as the nine-year passage of time between the crimes and the identification, resulting in Mrs. Cook's memory fading and her becoming "more vulnerable to suggestive influences," and the "highly suggestive" procedure of her "viewing a single photo [of the defendant] in a news article," which would increase her confidence in the identification of the defendant. Dr. Loftus described this as "[t]he phenomenon of 'photo-biased identification' [which] has been described in the psychological literature." She said that "[a]nother very important factor is what is called the confidence factor," meaning that "even if Mrs. Cook is expressing confidence in her current account, this does not mean she is accurate. Her confidence level could be influenced by many factors, e.g., viewing prior photos, or being hypnotized." Dr. Loftus concluded her opinion, saying, "Many of the factors that I would discuss are not clearly understood by jurors, and some are even in conflict with misconceptions that jurors have about the workings of memory, which is precisely why this sort of testimony can be helpful to jurors."

The trial court then conducted an evidentiary hearing on November 13, 2002, at which Dr. Loftus participated by telephone and was questioned by counsel for both sides. Subsequently, applying the holdings of our supreme court in *Coley* and *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257 (Tenn.1997), the trial court ruled that the testimony of Dr. Loftus was inadmissible:

> The proffered testimony of Dr. Loftus is remarkably similar to the testimony considered in the *Coley* case. Specifically, Dr. Loftus' opinion included information regarding the process of identification, the relationship of stress to memory, the difference between confidence in identification and actual accuracy of identification, the effect of passage of time on the identification and the suggestibility of [the] photograph presented to the witness in this case. The only significant difference between the testimony proffered in this case and that of *Coley* is that there is no cross-racial consideration presented

26

in this case. The court did not find anything in Dr. Loftus' testimony to be of a more specific nature than that addressed in *Coley*. Therefore, the court finds that the evidence is per se inadmissible.

*State v. Thomas*, 2005 WL 735040 at **21-22.

In 2000, prior to petitioner's conviction, the Tennessee Supreme Court held in *State v. Coley* that "general and unparticularized expert testimony concerning the reliability of eyewitness testimony, which is not specific to the witness whose testimony is in question," is "per se inadmissible" under the Tennessee Rules of Evidence. 32 S.W.3d at 838. On direct appeal, petitioner argued that the proffered testimony of Dr. Loftus was particularized and specific to Mrs. Cook's eyewitness testimony. The Tennessee Court of Criminal Appeals disagreed. *State v. Thomas*, 2005 WL 735040 at *24 ("[W]e conclude that the record supports the exclusion of the testimony of Dr. Loftus.").

Petitioner also argued on appeal that the exclusion of Dr. Loftus' testimony violated his right to due process. The appellate court disagreed for the reason that the expert testimony was not critical to the defense. *Id*. at *25. In doing so, the court noted the standard set forth in *Chambers v. Mississippi*, 410 U.S. 284 (1973).

> When considering whether the constitutional right to present a defense has been violated by the exclusion of evidence, the analysis should consider whether: (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important.

*State v. Thomas*, 2005 WL 735 040 at *25 (quoting *Coley*, 32 S.W.3d at 838 n.14, which in turn cited *Chambers v. Mississippi*, 410 U.S. at 298-301).

Petitioner then filed a petition for post-conviction relief in the state courts and alleged, *inter alia*, that the per se rule excluding expert testimony as to the reliability of eyewitness testimony violated his due process right to present a defense as recognized by the Supreme Court in *Chambers v. Mississippi*. He relied on the recent decision of *Holmes v. South Carolina*, 547 U.S. 319 (2006), in which the Supreme Court observed that arbitrary rules that exclude defense evidence are unconstitutional. *Id.* at 326. In the meantime, while petitioner's post-conviction petition was pending, the Tennessee Supreme Court on May 23, 2007, overruled *Coley*, leaving it to the discretion of the trial court to "evaluate the admissibility of expert testimony on the reliability of eyewitness identification." *State v. Copeland*, 226 S.W. 3d 287, 300 (Tenn. 2007).

Petitioner argued unsuccessfully in the trial court that, based upon *Holmes* and *Copeland*, his due process claim had not been previously determined on direct appeal.[1]

> At the hearing on the post-conviction petition, the petitioner presented no evidence and instead relied upon the argument of counsel to establish that because the decisions in *Holmes* and *Copeland* changed the "mode of analysis" on the issues, they had not been previously determined. The post-conviction court took the arguments under advisement and, in a later-filed order detailing its findings, denied post-conviction relief. The court concluded that the issues

---

[1]Tennessee law provides:

A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing. A full and fair hearing has occurred where the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence.

Tenn. Code Ann. § 40-30-106(h).

presented had been previously determined on direct appeal and that neither *Holmes* nor *Copeland* altered that finding. In addition, the post-conviction court concluded that the petitioner could not establish prejudice given this court's direct appeal finding that even if Mrs. Cook's identification testimony was excluded, the remaining evidence was more than sufficient to support his convictions.

*Thomas v. State*, 298 S.W.3d at 613-14.

The Tennessee Court of Criminal Appeals agreed:

The petitioner's claim that due process entitled him to the presentation of expert testimony on the reliability of eyewitness identification was heard and considered by the trial court and by this court on direct appeal. The trial court found that *Coley* barred the admission of this testimony under the rules of evidence and concluded that notwithstanding the evidentiary bar, the petitioner had failed to establish that, pursuant to the test established in *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), the evidence was critical to his defense as required to establish due process entitlement to the evidence. Similarly, when analyzing the petitioner's claim on direct appeal, this court initially concluded that the ruling in *Coley* barred the admission of the evidence under Tennessee Rule of Evidence 702 because it did not substantially assist the trier of fact and because it "invad[ed] the province of the jury in assessing the credibility of the eyewitness identifications." *Howard Walter Thomas*, slip op. at 29. In addition, this court concluded that the petitioner had failed to demonstrate a due process violation because the expert testimony was not critical to his defense. *Id.*, slip op. at 30.

Clearly, the petitioner's due process claim was heard and considered by two courts of competent jurisdiction after a full and fair hearing.

*Id.* at 614-15 (footnote omitted).

The appellate court thus concluded "because neither *Copeland* nor *Holmes* changed the analysis for determining a due process violation via the right to present a defense, the previous adverse determination of the petitioner's claim operates as a procedural bar to

post-conviction relief." *Id.* at 616. The court also held that "*Copeland* did not state a new rule of constitutional law that requires retroactive application." *Id.*

In *Chambers v. Mississippi*, the Supreme Court noted:

> The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defendant against the State's accusations. The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process.

*Chambers v. Mississippi*, 410 U.S. at 294. For that reason, the Court held that rules of evidence "may not be applied mechanistically" to exclude evidence that is "critical" to the defense. *Id.* at 302.

In this case, both the trial court at the trial stage and the Tennessee Court of Criminal Appeals on direct appeal determined that Dr. Loftus' testimony was not critical to the defense. *State v. Thomas*, 2005 WL 735040 at *25. On appeal from the denial of post-conviction relief, the Tennessee Court of Criminal Appeals reiterated that "[b]oth the trial court and [the appellate] court utilized the *Chambers* analysis to determine whether the petitioner's due process right to present a defendant was circumvented by the trial court's exclusion of the expert testimony." *Thomas v. State*, 298 S.W. 3d at 615.

The findings of the state courts are supported in the record. The determination that petitioner's right to due process was not violated by the exclusion of Dr. Loftus' testimony was neither contrary to, nor did it involve, an unreasonable application of, federal law as set forth in *Chambers v. Mississippi*. Mrs. Cook was questioned extensively by the defense as to her ability to identify petitioner after the passage of nine years. Much was made as well

as to her possible identification of other suspects. Petitioner is not entitled to relief on this claim.

**III.    In violation of U.S. Const. amend. V, VI, and XIV, the cumulative effect of these errors deprived Mr. Thomas of due process and a fair trial.**

Petitioner unsuccessfully raised this claim on direct appeal. "The defendant argues that the cumulative effect of the trial court's errors warrants a new trial. Having found no errors committed by the trial court, we respectfully disagree." *State v. Thomas*, 2005 WL 735040 at *32.

The Sixth Circuit has held in the past that, regardless of whether each of a petitioner's alleged errors, standing alone, would require a finding of deprivation of due process, a court may look to whether the cumulative effect of the errors was such that the petitioner was denied fundamental fairness. *See, e.g., Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Walker v. Engle*, 703 F.2d 959, 968 (6th Cir. 1983). These cases, however, were decided prior to the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which amended 28 U.S.C. § 2254 with regard to the standard of review in habeas corpus cases.

The Supreme Court has not held that a district court may look to the cumulative effects of trial court errors in deciding whether to grant habeas corpus relief. *See Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006) (death-penalty decision stating, "[T]he law of this Circuit is that cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue. No matter how misguided this case law may

31

be it binds us."); *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005) (death-penalty decision stating, "[W]e have held that, post-AEDPA, not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief."); *Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002) ("The Supreme Court has not held that constitutional claims that would not individually support habeas relief may be cumulated in order to support relief."); *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002) (death-penalty decision stating, "The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief."); *but see DePew v. Anderson*, 311 F.3d 742, 751 (6th Cir. 2002) (constitutional errors that might have been harmless when considered individually maybe be cumulated in a capital case, leading to a reversal of a death sentence).

Accordingly, because there is no Supreme Court precedent in this regard, petitioner cannot demonstrate that the Tennessee Court of Criminal Appeals' rejection of his cumulative effect argument was either contrary to, or an unreasonable application of, clearly established federal law as required by *Williams v. Taylor*.  *See Baze v. Parker*, 371 F.3d 310, 330 (6th Cir. 2004) (death penalty decision; petitioner's cumulative error theory lacks merit because it "depends on non-Supreme Court precedent").


V.     Conclusion

The petition for habeas corpus relief will be **DENIED** and this action will be **DISMISSED WITH PREJUDICE**.  Petitioner having failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability **SHALL NOT ISSUE**. 28

U.S.C. § 2253(c); Rule 22(b) of the Federal Rules of Appellate Procedure. The court **CERTIFIES** that any appeal from this action would not be taken in good faith and would be totally frivolous. *See* Rule 24 of the Federal Rules of Appellate Procedure. The court will further **DENY** petitioner leave to proceed *in forma pauperis* on appeal.

**AN APPROPRIATE ORDER WILL ENTER.**

    s/ Thomas W. Phillips    
United States District Judge
